**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **HAROLD GREENBERG, on behalf of himself and all others similarly situated,**<br><br>**Plaintiffs,**<br><br>vs.<br><br>**COOPER COMPANIES, INC.** *et al.*,<br><br>**Defendants.** | Case No.: 11-CV-05697 YGR<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND** |

Plaintiffs, who are shareholders of Defendant Cooper Companies, Inc. ("Cooper"), bring this securities fraud class action against Cooper, its Chief Executive Officer Robert S. Weiss ("CEO Weiss"), and its former Chief Financial Officer Eugene J. Midlock ("CFO Midlock") (collectively "Defendants") for allegedly making false and misleading statements in connection with the recall of defective contact lenses in order to manipulate Cooper's stock price. Plaintiffs' Consolidated Class Action Amended Complaint (Dkt. No. 43 ("CAC")) alleges two claims: (1) Securities Fraud Under Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b); and (2) Control-Person Liability Under Section 20(b) of the Securities and Exchange Act, 15 U.S.C. § 78t(a).

Defendants have filed a Motion to Dismiss on the grounds that the CAC fails to meet the pleading requirement for a securities fraud lawsuit imposed by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The Court heard oral argument on August 7, 2012.

Having carefully considered the papers submitted, the CAC, and the argument of counsel, for the reasons set forth below, the Court hereby **GRANTS** the Motion to Dismiss **WITH LEAVE TO AMEND**.

United States District Court
Northern District of California

# I.      BACKGROUND

In this securities fraud class action, Plaintiffs allege that between March 4, 2011, and November 15, 2011 ("Class Period"), Defendants artificially inflated Cooper's stock price by concealing and downplaying design flaws with its "Avaira" contact lenses resulting in serious injury to consumers, which ultimately led to multiple product recalls.

Cooper is a global medical products company that serves the specialty healthcare market through its two business units, CooperVision, Inc. ("CooperVision") and CooperSurgical, Inc. (CAC ¶¶ 3, 16.)  CooperVision is the third largest manufacturer of soft contact lenses in the world, with approximately 17% of the global market share, which provides 84% of Cooper's revenue.  (*Id.*)  CooperSurgical markets diagnostic products, surgical instruments, and accessories for the women's healthcare market.  (*Id.*)  Cooper's common stock is traded under the symbol "COO" on the New York Stock Exchange.  (*Id.* ¶ 16.)

The contact lens market has two major product categories:  spherical lenses, which correct near and farsightedness; and toric lenses, which address more complex visual issues including astigmatism. (*Id.* ¶ 3; Declaration of Stacey M. Sprenkel ("Sprenkel Dec."), Dkt. No. 47, ¶ 12, Ex. 11 at 5.)  Contact lenses are sold with recommended replacement schedules, often referred to as "modalities," which include single-use, two-week, and monthly.  (*Id.*)  CooperVision produces both a two-week silicone hydrogel lens brand called Avaira and a monthly silicone hydrogel lens brand called Biofinity.  At issue in this lawsuit is Cooper's Avaira product line.  The CAC alleges as follows:

### 1.      *Avaira Toric Rollout.*

On March 3, 2011, CFO Midlock announced that Cooper would be rolling out the toric version of its Avaira lens product line ("Avaira Toric") nationwide.  (CAC ¶ 33.)  The sphere version of the Avaira product line ("Avaira Sphere") had been on the market since 2008.  When Cooper designed and developed the Avaira Toric and the Avaira Sphere lenses at its Pleasanton, California facility, the facility was not certified, registered or otherwise approved by state or federal regulatory agencies to develop medical products.  (*Id.* ¶ 5.)  This lack of certification allowed Cooper to circumvent quality control requirements in the design of the Avaira Toric and Avaira Sphere

2

lenses.  (*Id.*)  As a result, both Avaira lens types contained unsafe amounts of silicone oil residue.  (*Id.* ¶ 48.)  These unsafe amounts of silicone oil residue resulted in a high incidence of hazy vision, and eye pain reported by consumers of Cooper contact lenses, which, in turn, led to the recall of both Avaira lens types.  (*Id.*)

Beginning in February or March of 2011, Cooper received a significant number of complaints about its Avaira lenses from consumers in Japan.  (*Id.* ¶¶ 23, 38.)  These complaints consisted of eye irritation and blurry vision.  By June or July 2011, the number of complaints grew to over 200, with the majority of those complaints coming from U.S. consumers.  (*Id.* ¶¶ 27, 39.)  Also by June or July 2011, CooperVision had launched an internal investigation into these complaints.  (*Id.* ¶ 27.)

According to the CAC, Defendants concealed the growing number of complaints of injury caused by the Avaira product line, and deliberately misled investors by publicly touting the "good design and good material" of the Avaira lenses and "high quality" of all of Cooper's silicone products and the Avaira Toric rollout was "going to do well."  (*Id.* ¶¶ 34, 42.)  Defendants also articulated the two-fold importance of the Avaira Toric lens to Cooper.  (*Id.* ¶ 35.)  As a two-week lens, the Avaira Toric sat in a "sweet spot"—the biggest part of the U.S. contact lens market and an area with only one other major competitor, Johnson & Johnson.  (*Id.*)  In addition, past experience had shown that rolling out a toric version of a brand would have a "halo" effect on sales of the sphere version of that same brand, not only opening up the toric market, but also propelling overall sales across the brand.  (*Id.* ¶¶ 36-37.)  Cooper's quarterly filings with the Securities and Exchange Commission ("SEC") communicated this same optimism.  (*Id.* ¶ 42 ("we have high quality silicone hydrogel lens products"); ¶ 49 ("Overall, we remain optimistic about the long-term prospects for the worldwide contact lens … markets").)

2.    *Avaira Toric Recall on August 19, 2011.*

On August 19, 2011, Cooper announced a "voluntary recall on limited lots of Avaira Toric contact lenses."  (*Id.* ¶ 53.)  Cooper announced that a limited recall resulted from the unintended presence of a residue on certain lenses.  (*Id.*)  The press release indicated that "[t]he residue was identified after investigating a small number of complaints of temporary hazy vision."

1   (*Id.*)  In the press release Cooper emphasized that "[t]his recall is limited solely to specific lots of

2   Avaira Toric, and no other Cooper Vision product is involved in this recall."  (*Id.*)  The press release

3   further stated that the "manufacturing issue" causing the problem "ha[d] been identified and a

4   resolution [wa]s in progress."  (*Id.*)

5      After the first recall, Cooper allegedly continued to conceal and misrepresent the scope of the

6   problems with its Avaira lenses.  Two weeks after the recall, during an August 31, 2011 conference

7   call CEO Weiss stated that "[a]side from the voluntary limited recall of Avaira Toric, all of

8   [Cooper's] silicone hydrogels are performing well … [including] Avaira Sphere."  (*Id.* ¶ 58.)  CEO

9   Weiss further indicated that the recall's impact had already been "built into [Cooper's] guidance"

10  and represented that the recall is "not a material event."  (*Id.* ¶ 59.)  Thereafter Cooper filed its third

11  quarter Form 10-Q with the SEC, which reiterated that only the Avaira Toric contact lens was

12  recalled, the recall was based on a small number of complaints, and Defendants once again stated

13  that "[o]verall, we remain optimistic about the long-term prospects for the worldwide contact lens."

14  (*Id.* ¶ 62 (alteration in original).)

15         3.      *Drop in Stock Price and Second Recall on November 15, 2011.*

16      On October 11, 2011, MSNBC.com published an article describing the serious

17  complications wearers were having with the Avaira Toric lenses and described Cooper's "limited

18  recall" as a "stealth recall" that left many consumers, and investors, unaware of the severity of the

19  safety problems.  After the MSNBC article appeared, Cooper's stock price traded on high volume

20  and dropped 8.2%, or $6.44 per share.  (*Id.* ¶ 67.)

21      On or about October 14, 2011, prompted by reports of problems associated with the Avaira

22  Toric lens, the U.S. Food and Drug Administration ("FDA") posted a Class I warning, calling for

23  Cooper to issue a full notice to the public of the reasons for the recall of 778,301 of its Avaira Toric

24  lenses.  (*Id.* ¶ 7.)  The FDA's action was prompted by its receipt of approximately 40 reports of

25  problems with the Avaira Toric lenses.  (*Id.*)

26      On November 15, 2011, Cooper expanded its recall to the Avaira Sphere lenses, recalling

27  nearly five million Avaira Sphere lenses that had already shipped.  As with the August 2011 recall,

28  Cooper attributed the recall to the presence of silicone oil residue on the lenses.  Cooper also

United States District Court
Northern District of California

1   disclosed that it had reserved more than $23 million for recall-related liabilities.  (*Id.* ¶ 8.)

2        As a consequence of its revelations about the true quality of its products, the price of

3   Cooper's common stock fell from a closing price of $64.95 per share on November 14, 2011, the

4   day prior to the disclosure of the expanded recall, to a close of $56.64 per share on November 15,

5   2011, the day of the announcement, on extremely heavy trading volume.  (*Id.* ¶ 9.)  This represented

6   a loss of $8.34 per share, or nearly 13% of share value.  (*Id.*)

7   **II.    DISCUSSION**

8        Defendants move for dismissal on the grounds that the CAC fails to identify any statements

9   that were false or misleading and fails to allege facts that suggest either named defendant was aware

10  of defects in the Avaira lenses when they made the allegedly false and misleading statements.

11  Defendants further argue that because they did not make any false or misleading statements, the drop

12  in Cooper's share price was the result of disappointing news, not because information was disclosed

13  to the market that corrected earlier false or misleading statements.[1]

14  **A.    LEGAL STANDARD**

15       To withstand a motion to dismiss for failure to state a claim under Rule 12(b)(6), Plaintiffs

16  must allege sufficient details to give the defendants fair notice of the nature of the claim and the

17  grounds upon which it rests.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007).  On a

18  motion to dismiss a Section 10(b) action for failure to state claim on which relief can be granted, a

19  court must consider the complaint in its entirety, as well as other sources that courts ordinarily

20  examine when ruling on such motions, in particular, documents incorporated by reference into the

21  _____

22  [1] The Court notes that some of the Defendants' arguments ignore numerous allegations in the CAC.  For instance, despite allegations that there were over 200 complaints ranging from hazy vision, eye irritation,

23  redness, and abrasions to torn corneas, Defendants argue that the CAC "does not describe the nature or number of the complaints." (Mot. 1, 6, 7, 9.)  Additionally, Defendants argue that the allegations that the lack

24  of regulatory oversight and quality assurance standards at Cooper's Pleasanton facility "does not show any connection between certification and silicone oil residue" (*see id*. at 2), which ignores allegations that this lack

25  of regulatory oversight and quality assurance standards allowed Cooper to design a contact lens for manufacture after very limited testing on how defined amounts of silicone oil would affect the human eye and

26  without defined specifications for the amount of silicone oil in the Avaira lenses   Similarly, Defendants characterize allegations that Cooper needed to certify its Pleasanton facility to design medical products as

27  "conclusory" and appear to argue that without more evidentiary facts, it is implausible to allege that the chief executive or chief financial officer of a company that designs and manufactures medical products would be

28  aware that its main design facility was not registered to design medical products.  (*Id.* at 2, 7.)

1  complaint, and matters of which a court may take judicial notice.[2]  *Tellabs, Inc. v. Makor Issues &*

2  *Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Additionally, because this is an action for securities fraud,

3  "the circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. P.

4  9(b).

5  **B.    COUNT I:  SECTION 10(b)**

6       Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), makes it unlawful for

7  any person to "use or employ, in connection with the purchase or sale of any security … any

8  manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

9  Commission may prescribe as necessary or appropriate in the public interest or for the protection of

10 investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful

11 to, among other things, "make any untrue statement of a material fact or to omit to state a material

12 fact necessary in order to make the statements made, in the light of the circumstances under which

13 they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

14      In 1995, Congress enacted the PSLRA as a check against abusive litigation[3] by private

15 parties.  *Tellabs*, *supra*, 551 U.S. at 313.  Heightened pleading is one of the control measures

16 Congress included to advance "the PSLRA's twin goals:  to curb frivolous, lawyer-driven litigation,

17 while preserving investors' ability to recover on meritorious claims."  *Id.* at 322.  Under the

18 PSLRA's heightened pleading requirement, to state a Section 10(b) claim, Plaintiffs must allege

19 facts sufficient to establish (i) that the defendant made a material misrepresentation or omission of

20 fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the

---

21 [2] When ruling on a motion to dismiss, a court may consider documents whose contents are incorporated by
22 reference in a complaint or upon which a complaint necessarily relies when authenticity is not contested, and
   matters subject to judicial notice.  *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999),
23 *abrogated by statute on other grounds as recognized in S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784
   (9th Cir. 2008); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  The Court takes judicial notice
24 of the exhibits attached to the Sprenkel Declaration.  The Court takes judicial notice of the fact that certain
   documents were publicly-filed and the fact that certain statements were made in those documents on the dates
25 specified, but not the truth of the statements contained therein.

26 [3] Members of the House and Senate "observed that plaintiffs routinely were filing lawsuits 'against issuers of
   securities and others whenever there [was] a significant change in an issuer's stock price, without regard to any
27 underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually
   to some plausible cause of action[.]'"  *In re Silicon Graphics*, *supra*, 183 F.3d at 978 (quoting H.R. Conf. Rep.
28 104–369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730) (alterations in original).

misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss. *Metzler Inc. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008). The parties contest whether the CAC adequately pleads the (1) scienter, (2) material misstatement, and (3) loss causation elements. Because scienter is central to the allegations of securities fraud, the Court will address that element first.

> ### 1.  SCIENTER.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *See Tellabs*, *supra*, 551 U.S. at 319. Under the PSLRA, the complaint must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) *compare with* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). The required state of mind is "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, *supra*, 552 F.3d at 991.

In ruling on a motion to dismiss for failure to plead a strong inference of scienter, the Court must not consider the factual allegations in isolation, but instead, the Court must determine whether, taken collectively, all the facts alleged give rise to a strong inference of scienter. *Tellabs*, *supra*, 551 U.S. at 322-23, 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *S. Ferry*, *supra*, 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement"). "When conducting this holistic review, however, [a court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco*, *supra*, 552 F.3d at 1006 (quoting *Tellabs*, *supra*, 551 U.S. at 323). To satisfy the scienter requirement, a plaintiff "must plead facts rendering an inference of scienter *at least as likely* as any plausible opposing inference." *Tellabs*, *supra*, 551 U.S. at 328 (emphasis in original).

Plaintiffs argue that they have sufficiently pled an inference of scienter based on: (a) the individual Defendants' roles within the company, also known as the "core operations inference"; (b) statements by confidential witnesses; and (c) the individual Defendants' suspicious stock sales. The

1    Court considers all relevant factors both independently (subsections a, b, and c) and make a final

2    determination based upon a "holistic review" of the allegations (subsection d).

3                        a)        *Core operations inference.*

4                                  Allegations of scienter based on the defendants' roles within the company, *i.e.*,

5    the "core operations inference," may support scienter either independently or in combination with

6    other allegations.  *See S. Ferry*, *supra*, 542 F.3d at 784-86.  As a general matter, "corporate

7    management's general awareness of the day-to-day workings of the company's business does not

8    establish scienter—at least absent some additional allegation of *specific information conveyed to*

9    *management and related to the fraud.*"  *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540

10   F.3d 1049, 1068 (9th Cir. 2008) (emphasis supplied).  Thus, unless the core operations inference is

11   particularly strong, the inference will not independently support a finding of scienter.  Circumstances

12   in which the "core operations inference" will independently suffice are:  (1) when the nature of the

13   relevant facts is of such prominence that it would be "absurd" to suggest that management was

14   unaware of the matter; or (2) when the complaint provides detailed and specific allegations about

15   management's exposure to factual information within the company.  *See Zucco*, *supra*, 552 F.3d at

16   1000-01.

17                Plaintiffs argue that the core operations inference independently supports a finding of

18   scienter.  Specifically, Plaintiffs recite the following sequence of events:

19           [Cooper] (1) experienced declining sales in its older contact lenses and worried
             competitors' silicone hydrogel models posed a risk to its business; (2) entered the
20           silicone hydrogel market late and worked to catch up despite limited manufacturing
             capacity; (3) eschewed state and federal oversight in designing its newest silicone
21           hydrogel lenses, the Avaira line, at home in its Pleasanton headquarters[4]; (4) received
             hundreds of complaints about the Avaira lenses between February/March 2011 and
22           June/July 2011, whose severity it tracked via a graphical "Pareto analysis"[5]; (5)

23

24   _____

     [4] The CAC implies that the design problems with the Avaira product line were caused by the alleged fact that
25   the Pleasanton facility was not registered, approved, and/or certified to develop medical products.  (CAC ¶¶ 5,
     26-29, 32, 40-41, 48, 54, 61, 105.)  However, the CAC never specifically indicates that Cooper "eschewed"
26   state and federal oversight in designing the Avaira product line.

27   [5] The CAC alleges that during one meeting that took place in February or March of 2011, CooperVision's
     Engineering Director Samuel Puig made a graphical representation, known as a Pareto Analysis to "rank" the
28   severity of complaints from Japan.  (CAC ¶ 23.)  The CAC then alleges that by June or July 2011, Cooper had
     received over 200 complaints, mostly from the United States.  (*Id.* ¶¶ 27, 39, 54.)  However, there is no

                                                    8

launched an internal investigation into these complaints at some point during or before June/July 2011; (6) completed the internal investigation, determined that a design/manufacturing problem, consisting of excess silicone oil residue, caused the problems; (7) initiated a recall of specified Avaira Toric lots; (8) announced the creation of a $14 million reserve to cover recall-related costs; (9) worked with the FDA to develop new quality standards for both the Avaira Toric and Avaira Sphere lenses, neither of which had previously had design specifications for silicone oil included in their bill of material; (10) expanded the August 19, 2011 recall to encompass Avaira Sphere lenses; and (11) increased the recall-loss reserve to $23 million.

(Pl's Opp'n 18-19.)  Plaintiffs argue that based on this sequence of events, "[i]t strains credulity past the breaking point to suggest Defendants were unaware any of this was going on." (*Id.* at 19.)  Facts numbered (1), (2), (8), and (9), however, are not pled in the CAC.

Plaintiffs allege that Defendants must have known about the problems regarding the Avaira Toric lenses because there were more than 200 customer complaints about hazy vision, eye irritation, and redness between February and July 2011.  In *Berson v. Applied Signal Technology, Inc.*, the Ninth Circuit permitted a securities plaintiff to rely solely on the core operations inference where the defendants allegedly failed to disclose "stop-work orders" from the company's largest customers even though those orders had "a devastating effect on the corporation's revenue." 527 F.3d 982, 987 (9th Cir. 2008).  There, the first stop-work "halted between $10 and $15 million of work on the company's largest contract with one of its most important customers." *Id.* at 988 n. 5.  Plaintiffs contend, without elaboration, that *Berson* involved "analogous and perhaps even less salient facts" and a smaller monetary loss to the company.  (Pl.'s Opp'n 19.)  While Cooper set aside a $23 million reserve fund for the recall, the Avaira product line accounted for approximately 1% of Cooper's revenue.  (*See* Sprenkel Dec., Ex. 6.)  Thus, unlike *Berson*, where the stop-work orders were devastating to the company, the present allegations, taken collectively, do not compel a strong inference that the customer complaints about the Avaira Toric lenses so greatly impacted Cooper's bottom line at the time that it would be absurd to suggest the Defendants were unaware that the contact lenses were defective.

indication that a Pareto chart was used in June or July 2011 to track the complaints or that this information was conveyed to upper management.

1      At best, the CAC raises a weak inference that *prior to* the August 19, 2011 recall, the

2 individual Defendants knew or should have known about problems associated with the Avaira Toric

3 lenses.  For example, Plaintiffs claim that senior management was required to "stay apprised of

4 quality issues and complaints" under the ISO 9000 and 13458 certification mandate.[6]  (CAC ¶ 25.)

5 The requirement that senior management "stay apprised" of quality control matters does not by itself

6 indicate that the named Defendants actually were aware of the quality control problems alleged in

7 the CAC so as to support the necessary inference of scienter.  Along these same lines, Plaintiffs

8 imply that CEO Weiss, and perhaps CFO Midlock, knew of these problems because CooperVision

9 President John Weber ("Weber") was aware of these quality issues, and Weber "reported directly to

10 Defendant Weiss."  (*Id.*)  Plaintiffs do not allege that Weber and CEO Weiss (or CFO Midlock) ever

11 discussed the quality of the Avaira Toric lenses.

12      Furthermore, and notwithstanding Plaintiffs' contention that there was a lack of regulatory

13 oversight at the Pleasanton facility, Plaintiffs argue that the core operations inference is particularly

14 strong here due to the heavily regulated nature of the medical products industry.  In support,

15 Plaintiffs rely upon the First Circuit's decision in *Mississippi Public Employees' Retirement System*

16 *v. Boston Scientific Corp.*, 523 F.3d 75 (1st Cir. 2008).  In *Boston Scientific* a manufacturer of

17 coronary stents allegedly knew of serious problems with its stents, but downplayed reports of patient

18 deaths by claiming the cause was the doctors' own unfamiliarity with the product.  The First Circuit

19 found allegations that the defendant was planning a change in the manufacturing process to remedy

20 the problem while at the same time telling the public that the problem was doctor unfamiliarity, was

21 sufficient to support a strong inference that the defendants knew the problem was not doctor

22 unfamiliarity but a design defect, which it had already determined how to fix.  The court rejected the

23 argument that these allegations were simply fraud by hindsight (*i.e.*, because a bad outcome

24 occurred, defendant's past optimism must have been fraud).  The First Circuit noted that the

25 company claimed it had been monitoring and investigating the problem, and given that it was in a

26

27 ───────────

[6] Plaintiffs do not identify the meaning or significance of either ISO certification.  ISO is a non-governmental organization that develops international standards related to quality management systems to ensure products
28 and services are safe, reliable and of good quality.  ISO certification is a written assurance by an independent body that a product, service or system meets specific requirements.  *See* www.iso.org/iso/home.htm

United States District Court
Northern District of California

highly regulated industry, it was fair to infer that the company not only monitors reports of patient injuries but also looks for prompt solutions to such problems.

In *In re Daou Systems, Inc.*, the Ninth Circuit held that specific and particular accusations created a strong inference of scienter where the plaintiffs alleged that executives monitored the data that was the subject of the allegedly false statements.  411 F.3d 1006, 1022-23 (9th Cir. 2005). There, plaintiffs relied on "specific admissions from top executives that that they [were] involved in every detail of the company and that they monitored portions of the company's database."  *Id.*; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (finding a strong inference of scienter where CEO was quoted as saying: "All of our information is on one database.  We know exactly how much we have sold in the last hour around the world," which was considered a specific and detailed statement about defendants' actual knowledge).

Here, Cooper launched an internal investigation into reports of problems with the Avaira Toric lens in June or July 2011.  Then, in August and September 2011, Defendants publicly disclosed that Cooper investigated complaints about the Avaira Toric lens, Defendants announced the results of that investigation, and initiated a limited recall of Avaira Toric lenses.  Less than two months later, MSNBC.com would characterize this as a "stealth" recall that downplayed the injuries suffered by consumers.  This raises the questions of *what* the Defendants knew about problems associated with the Avaira Toric lens and *when* they learned about these problems.

Once Cooper initiated a recall of Avaira Toric lenses, the core operations inference of scienter begins to strengthen.  However, Plaintiffs speculate, but do not allege specific facts about Defendants' knowledge of and exposure to the problems regarding the Avaira lenses *prior* to the first recall on August 19, 2011.  Moreover, Plaintiffs never allege that Cooper was aware of the more severe problems associated with its Avaira Toric lenses, such as torn corneas, *prior* to the October 11, 2011 MSNBC.com article.  Further, Plaintiffs fail to allege that *prior* to the November 15, 2011 recall of the Avaira Sphere lens that Defendants knew there were defects with its Avaira Sphere lenses, or that the Defendants had any reason to suspect that the Avaira Sphere lenses might contain the same defects as its Avaira Toric lenses.  Accordingly, because Plaintiffs fail to allege "detailed and specific allegations" of Defendants' knowledge of problems with the Avaira brand of contact

United States District Court
Northern District of California

lenses, Plaintiffs' allegation based on Defendants' roles in the company is insufficient, independent

of other allegations, to give rise to a strong inference of scienter.

        *b)*      <u>*Confidential witness as sources of information.*</u>

        Plaintiffs next rely upon statements of confidential witnesses to support their

allegations of scienter.  A complaint relying on statements from confidential witnesses satisfies the

PSLRA's pleading requirements if: (1) it "provide[s] an adequate basis for determining that the

witnesses in question have personal knowledge of the events they report"; and (2) the confidential

witnesses' statements are "themselves indicative of scienter." *Zucco*, *supra*, 552 F.3d at 995; *see In*

*re Silicon Graphics*, *supra*, 183 F.3d at 985 ("It is not sufficient for a plaintiff's pleadings to set forth

a belief that certain unspecified sources will reveal, after appropriate discovery, facts that will

validate her claim.").

        Here, the statements from Plaintiffs' three confidential witnesses are based on personal

knowledge.  All three confidential witnesses ("CW1," "CW2," and "CW3,"[7] respectively) worked at

the Pleasanton facility and state that the Pleasanton facility was not certified to design or

manufacture medical products, and that the Research and Development Group at the Pleasanton

facility resisted efforts to impose quality assurance standards.  CW1 also explained how this lack of

regulatory oversight and quality assurance standards directly led to the problems with excess

silicone oil residue on the Avaira lenses.  Additionally, according to CW1, Cooper first received

reports of problems with the Avaira Toric lenses as early as February or March 2011.[8]  (CAC ¶ 21.)

These problems included "hazy vision, stinging, eye irritation, redness, and abrasions" (*id.* ¶ 23), but

---

[7] CW3 stopped working at CooperVision in January 2009, over two years prior any of the alleged false or misleading disclosures, so his statements, for example, that "management did not fully understand or respect the importance of the design control process," add very little to the scienter analysis with respect to conduct that occurred in 2011.  (CAC ¶¶ 31-32.)

[8] According to CW1, these adverse reports came from consumers in Japan.  Defendants argue that CW1 is unreliable (and should therefore be discredited) because at the time of the alleged complaints Avaira lens had not even been sold in Japan.  In support Defendants cite to transcripts of conference calls with investors where the named Defendants stated that CooperVision had no presence in Japan.  Plaintiffs claim the named Defendants made material misrepresentations and omissions during those conference calls in order to manipulate the stock market, so the argument that the Court must accept as true any of the statements made by the named Defendants during the course of one of those conference calls simply ignores the underlying basis for this lawsuit.

United States District Court
Northern District of California

1 *not* complaints of severe eye problems like torn corneas and other problems that required emergency

2 room treatment as reported by MSNBC.com.  According to CW2, the number of adverse reports

3 increased to over 200 by early June or July 2011.  (*Id.* ¶¶ 27, 39.)

4     CW1 provided information from which to infer that problems associated with the Avaira

5 lenses may have been conveyed to the Defendants.  CEO Weiss may have been aware of these

6 problems prior to the recall because CooperVision President John Weber, who "reported directly to

7 Defendant Weiss," (i) attended quarterly senior management meetings "where quality issues were

8 also discussed"; and (ii) Weber "was informed about the quality problems."  (*Id.* ¶ 25.)  CW1 also

9 stated that ISO certification requires that senior management "stay apprised of quality issues and

10 complaints."  (*Id.*)

11     Defendants argue that CW2, a Senior Global Quality Assurance Manager, first learned of the

12 "200 complaints related to the Avaira lenses" in June or July 2011.  (*Id.* ¶¶ 26-27, 31.)  Defendants

13 note that the allegation that CW2, whose job was to monitor quality issues, was not aware of these

14 complaints until June or July 2011, renders it less likely that either named Defendant would have been

15 aware of the complaints prior to that time.  However, the CAC also alleges that CW2 learned of these

16 quality control issues from his supervisor, who, according to CW1, was aware of these issues as early

17 as February 2011.

18     The opinions of Plaintiffs' confidential witnesses are not sufficiently fact based to infer that

19 specific information about adverse reports was conveyed to the Defendants.  Accordingly, the

20 information disclosed by Plaintiffs' confidential witnesses does not independently suffice to support

21 a strong inference of scienter.

22              *c)*     *Stock sales.*

23     Finally, Plaintiffs allege that at the same time that Cooper's executives were

24 touting the quality of the Avaira lenses, they were selling off their own shares of Cooper stock,

25 pocketing over $14.2 million dollars in illicit benefits.  (CAC ¶ 9.)  "Insider stock sales are not

26 inherently suspicious."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1092 (9th Cir. 2002).  Rather,

27 to support an inference of scienter, Plaintiffs "must allege 'unusual' or 'suspicious' stock sales."

28 *Ronconi v. Larkin*, 253 F.3d at 435; *see Zucco*, *supra*, 552 F.3d at 1005 ("'unusual' or 'suspicious'

United States District Court
Northern District of California

1  stock sales by corporate insiders may constitute circumstantial evidence of scienter.”); *Metzler*,

2  *supra*, 540 F.3d at 1066-67 (sales that are “‘dramatically out of line with prior trading practices at

3  times calculated to maximize the personal benefit from undisclosed inside information.’”) (quoting *In*

4  *re Silicon Graphics*, *supra*, 183 F.3d at 986).  Relevant factors that are used to consider whether

5  stock sales were “unusual” or “suspicious” include: (1) the amount and percentage of shares sold; (2)

6  whether the sales were consistent with the defendant’s trading history; and (3) the timing of the sales.

7  *See Metzler*, *supra*, 540 F.3d at 1067.

8      Plaintiffs argue that the Defendants’ stock sales were not consistent with their prior trading

9  history and that the timing of all of their sales took place before the October 2011 MSNBC.com

10  article that caused the first drop in share price.  On June 11, 2011, CEO Weiss sold 83,104 shares of

11  stock worth more than $6 million.  (CAC ¶¶ 17, 87(a).)  CEO Weiss had last sold shares in

12  September 2008, nearly three years earlier.  (*Id.*)  On April 13, 2011, June 6, 2011, and September 8,

13  2011, CFO Midlock sold a total of 110,928 shares of stock worth more than $8.1 million.  (*Id.* ¶¶ 18,

14  87(b).)  CFO Midlock, who had worked at Cooper since 2007, had no prior trading history.  (*Id.*)  As

15  of October 13, 2010, a total of 46.5 million shares of Cooper’s common stock were outstanding.  (*Id.*

16  ¶ 75.)

17      Defendants argue that the sales were not “unusual” or “suspicious.”[9]  They provide

18  explanations for the timing of the Defendants’ stock sales in the Class Period.  CEO Weiss sold

19  83,104 shares of Cooper stock, which accounted for 14% of his total holdings of Cooper stock, to

20  fund the exercise of 108,000 shares of expiring stock options.  (*See* Sprenkel Dec., Ex. 33.)  CFO

21  Midlock’s stock sales were done in advance of his December 2011 retirement.[10]  Defendants argue

22

23  ───────────────

[9] Defendants also argue that CEO Weiss—but not CFO Midlock, who was retiring—was interested in the long

24  term success of Cooper, which makes his alleged participation in share price manipulation to maximize short
   term gains irrational.  They proffer no evidentiary support for this factual assertion or legal authority to

25  support dismissal of the lawsuit on this basis.

26  [10] Defendants’ apparent position is that for a securities fraud plaintiff to plead that a defendant’s stock trades
   were unusual, a plaintiff cannot rely upon the defendant’s trading history, but instead must provide

27  particularized details of how a company’s stock plan would have permitted the defendant to make stock trades
   at a different time.  For example, although Defendants do not argue that Cooper’s stock plan would have

28  prevented CFO Midlock from selling his shares earlier, they argue that the CAC “does not plead facts showing
   that such a sale would have been within Cooper’s guidelines, which set out minimum stock ownership levels

United States District Court
Northern District of California

1   that CEO Weiss's lone sale of stock in June and CFO Midlock's sales of stock in April and June (but

2   not September) are not "unusual" or "suspicious" because the sales occurred prior to the time that

3   CW2, the Senior Quality Assurance Manager, learned of the complaints regarding the Avaira Toric

4   lenses, it is unlikely that Defendants' sales were made with knowledge of these complaints.

5     Without more, the Court does not find that Defendants' sale of Cooper stock was sufficiently

6   unusual or suspicious so as to support independently a strong inference of scienter.

7         *d)*   *Holistic Review*

8     The Court must consider the allegations holistically and determine whether,

9   taken collectively, all the facts alleged give rise to a strong inference of scienter during the Class

10   Period itself, here, March 4, 2011 through November 15, 2011. *Tellabs*, *supra*, 551 U.S. at 322-23,

11   326. "When conducting this holistic review, however, [a court] must also 'take into account plausible

12   opposing inferences' that could weigh against a finding of scienter." *Zucco*, *supra*, 552 F.3d at 1006

13   (quoting *Tellabs*, *supra*, 551 U.S. at 323). Scrutinized in isolation, the inference of scienter is weak

14   but considered holistically, these allegations raise the question of what Defendants knew and when.[11]

15     In August and September 2011, the Defendants represented that Cooper investigated a small

16   number of minor complaints regarding the Avaira Toric lenses, the problem had been identified, and

17   a resolution was in process. By announcing that Cooper conducted an investigation into complaints

18   and that the Defendant had identified the source of the problem, it is fair to infer that Cooper

19   actually investigated the complaints and that the Defendants knew or should have known about the

20

21   for senior executives." (Mot. 22.) Defendants do not cite any legal authority to support such a pleading
 requirement.

22

23   [11] Plaintiffs have raised a number of new facts in the Opposition brief that they did not allege in the CAC.
 These new facts include: Cooper experienced declining sales in its older contact lenses and was worried that

24   competitors' silicone hydrogel models posed a risk to its business (Opp'n 1); Cooper acknowledged that its
 future in the contact lens market hinged on its ability to successfully develop and sell silicone-based products

25   (*id.*); during the Class Period, silicone lenses accounted for the bulk of Cooper's growth while sales for the
 older more conventional lenses consistently declined (*id.* at 1-2); the day after the MSNBC.com report,

26   Defendants issued a press release and Form 8-Q downplaying the recall (*id.* at 6); Cooper "announced the
 creation of a $14 million reserve to cover recall-related costs" (from which Plaintiffs argue it "would seem

27   impossible for a multi-million dollar reserve to be set aside without Defendants' knowledge") (*id.* at 18-19);
 named Defendants "knew from their consumer complaints and internal investigation that the Avaira Sphere

28   lenses had the same excess residue problem and many lots needed to be pulled from the market" (*id.* at 12-13).

number of complaints that Cooper had received (over 200 by June or July 2011) and the nature of those complaints (hazy vision, stinging, eye irritation, redness, and abrasions).

On or about October 11, 2011, approximately seven weeks after the August 19, 2011 recall, MSNBC.com posted an article exposing Cooper's alleged "stealth recall," reporting that there were hundreds of complaints ranging from minor to more severe problems like torn corneas. Based upon this news, Cooper's stock price dropped 8.2%. All of the Defendants' insider stock sales occurred prior to the MSNBC.com article. While weak circumstantial evidence of scienter, the timing of the insider sales is suspicious.

These facts do raise an inference that as early as August 19, 2011, Defendants were aware of problems with the Avaira Toric lenses but downplayed those problems, which kept the stock price artificially inflated until October 11, 2011, when the MSNBC.com article was posted. However, according to the confidential witnesses themselves, Cooper only received complaints of hazy vision, stinging, eye irritation, redness, and abrasions, *not* complaints of severe eye problems like torn corneas and other problems that required emergency room treatment as reported by MSNBC.com. There are no allegations that the Defendants were necessarily aware of these more severe problems *prior* to the MSNBC.com report on October 11, 2011. Furthermore, in the CAC, Plaintiffs *do not allege* facts from which to infer that the Defendants knew that (i) the August 19, 2011 recall of Avaira Toric lenses would later be expanded to include Avaira Sphere lenses; or (ii) the circumstances of its recall announced on November 15, 2011.

Based upon the foregoing, the Court finds that, when viewed holistically, the CAC fails to allege facts that support a strong inference of scienter for the Class Period of March 4, 2011 to November 15, 2011.

### 2. MATERIAL MISSTATEMENT.

When a plaintiff's claim is based on a misrepresentation or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Metzler*, *supra*, 540 F.3d at 1061 ("vague allegations of

United States District Court
Northern District of California

1    deception unaccompanied by a particularized explanation stating why the defendant's alleged

2    statements or omissions are deceitful" fails to state a claim).

3          Absent a duty to disclose, an omission, even with respect to information that a reasonable

4    investor might find material, is not misleading.  *See Basic*, *supra*, 485 U.S. at 239 n.17.  Companies

5    can control the information they disclose by controlling what they say to the market.  Once

6    information is conveyed to the market, disclosure is required when necessary "to make … statements

7    made, in light of the circumstances under which they were made, not misleading."  *Matrixx*

8    *Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1321 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

9    "[A]ssessing the materiality of adverse event reports is a 'fact-specific' inquiry that requires

10   consideration of the source, content, and context of the reports."  *Id*. (internal citations omitted).

11         For an omission to be actionable under the securities laws, it must be misleading as to a

12   material fact.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Under the

13   "total mix" standard of *Basic Inc. v. Levinson*, an omission is material if there is "'a substantial

14   likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor

15   as having significantly altered the 'total mix' of information made available.'"  485 U.S. 224, 231-32

16   (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "[I]n other words

17   it must affirmatively create an impression of a state of affairs that differs in a material way from the

18   one that actually exists."  *Brody*, *supra*, 280 F.3d at 1006.

19         The Complaint challenges fifteen statements made by Defendants on eight occasions

20   between March 3, 2011 and September 2, 2011.  In essence, Plaintiffs' theory is that any positive

21   statement by Cooper during the Class Period was misleading if it did not disclose that Cooper had

22   received hundreds of complaints from customers wearing its contact lenses who were experiencing

23   blurry, hazy vision and torn corneas.  In contrast, Defendants argue that none of their representations

24   were false or misleading, and that they were under no duty to disclose any of the allegedly omitted

25   information.

26         If a company has received a large number of complaints of problems with its contact lenses,

27   including complaints of torn corneas and other problems that require emergency room treatment, it

28   may be misleading to omit that information when disclosing an investigation into "a small number

of complaints of temporary hazy vision."  Likewise, stating that a recall is limited to certain lots of toric contact lenses may be misleading if the speaker knows that the recall will not be so limited. That Cooper's share price dropped 8.2% and 13.1% when this information became public demonstrates that investors considered this information to be material.  Depending on what the Defendants knew and when they knew, certain statements that proved to be wrong in hindsight may have been material misrepresentations and/or omissions.  However, some of these statements may fall within the PSLRA's safe harbor provision.

The PSLRA provides "a safe harbor[12] for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements."  *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004).  "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues."  *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003).  "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter."  *In re Cutera Sec. Litig.*, 610 F.3d 1103,

---

[12] The safe harbor provision states in relevant part that:

a person … shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that—

(A) the forward-looking statement is—

(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or

(ii) immaterial; or

(B) the plaintiff fails to prove that the forward-looking statement—

(i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was—

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).  The safe harbor provision of the PSLRA also provides that "the court shall consider any statement cited in the complaint and any cautionary statement accompanying … forward-looking statement[s], which are not subject to material dispute, cited by the defendant."  *Id.* § 78u-5(e).

United States District Court
Northern District of California

1    1112 (9th Cir. 2010).  Alternatively, if a forward-looking statement is not identified as such or is

2    unaccompanied by meaningful cautionary statements, then the statement is actionable only if the

3    plaintiffs allege that the forward-looking statement "was made with actual knowledge by that person

4    that the statement was false or misleading."  15 U.S.C. § 78u-5(c)(1)(B); *see Provenz v. Miller*, 102

5    F.3d 1478, 1487 (9th Cir. 1996).  The safe-harbor provision does not apply to a description of past or

6    present events.  *Id*. at 936-37.

7            Here, the parties dispute whether eleven of the fifteen challenged statements were identified

8    as forward-looking statements and were accompanied by meaningful cautionary language.  At the

9    beginning of each conference call and in each SEC Form 10-Q filing the Defendants included

10   cautionary language of "forward-looking statements" that "may be incorrect or imprecise and are

11   subject to risks and uncertainties," including the possibility of "major disruption in the operations of

12   our manufacturing facilities … due to technological problems … and [c]ompliance costs and

13   potential liability in connection with U.S. and foreign healthcare regulations, including product

14   recalls …."  Plaintiffs contend that the Defendants failed to provide "meaningful cautionary

15   statements,"[13] and also that many of the statements are not forward looking.

16           Some of the statements identified by Defendants are forward looking.  For example, during a

17   March 3, 2011 conference call, CFO Midlock stated that Cooper would "be rolling out Avaira Toric

18   imminently," and that "we would expect to continue to gain [market] share," while CEO Weiss

19   added that the Avaira lens was "going to do well."  Additionally, Cooper's September 2, 2011 Form

20   10-Q filing with the SEC includes a prediction that Avaira Toric "inventory will return to normal

21   levels by December 1, 2011" falls under the PSLRA's safe harbor provision.  An ancillary

22   prediction that "inventory will return to normal levels by December 1, 2011" does not bring the

23   entirety of the following statement under the PSLRA's safe harbor provision, as Defendants argue:

24           In August 2011, CooperVision initiated a voluntary recall on limited lots of Avaira

25   _____

26   [13] This cautionary language in the Form 10-Q is not materially different from the cautionary language held
     sufficient by the Ninth Circuit in *In re Cutera*, *supra*, 610 F.3d at 1112 (defendant properly identified
27   statements as forward-looking by beginning an analyst call with a notice that "these prepared remarks contain
     forward-looking statements concerning future financial performance and guidance, that 'management may
28   make additional forward-looking statements in response to [ ] questions,' and that factors like Cutera's 'ability
     to continue increasing sales performance worldwide' could cause variance in the results").

United States District Court
Northern District of California

> Toric contact lenses.  This recall is limited solely to specific lots of Avaira Toric, and no other CooperVision product is involved in this recall.  The recall was initiated because of the unintended presence of a residue on certain lenses.  The residue was identified after investigating a small number of complaints of temporary hazy vision.  The manufacturing issue has been identified and a resolution is in process.  We anticipate *inventory will return to normal levels by December 1, 2011.*

(CAC ¶ 62 (italicized portion referenced above).)

The PSLRA's safe harbor provision applies only to forward looking statements and simply because part of a statement contains a prediction does not place the entire statement under the PSLRA's safe harbor provision.  Accordingly, Defendants have not persuaded the Court that all of the statements identified by Plaintiffs actually fall under the PSLRA's safe harbor provision.  Based on the foregoing analysis, the Court will not dismiss the CAC on this basis.

Consistent with the finding on scienter above, because Plaintiffs have not adequately pled that the prior disclosures were knowingly false when made, Plaintiffs have failed to allege this second material misrepresentation or omission element.

### 3.   LOSS CAUSATION

Loss causation refers to the causal connection between the material misrepresentation or other fraudulent activity and the loss.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (inflated purchase price will not itself constitute or proximately cause the relevant economic loss).  To plead loss causation, Plaintiffs must allege three elements:  (1) a misrepresentation or omission inflated the share price; (2) a corrective disclosure[14] revealed the statement was fraudulent; and (3) as a result of the disclosure, share price fell.[15]  *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) (citing *Dura*, *supra*, 544 U.S. at 342).

---

[14] A corrective disclosure is disclosure to the market of information that corrects prior misstatements.  *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266-67 (S.D. Cal. 2010) ("A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market.'") (quoting *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 818 (D.Ariz. 2009)) (citations omitted).

[15] Defendants also dispute the truth of the allegations that the recalls impacted the stock price by arguing that Cooper met its fourth quarter financial guidance.  This is a factual dispute and not a pleading issue; even if Cooper met its fourth quarter guidance for the period ending December 31, 2011, it does not prove there is no relationship between the announcement of a product recall on November 14, 2011 and a 13% drop in share price on November 15, 2011.

On October 11, 2011, the day after the MSNBC.com post, Cooper's share price dropped 8.2%, or $6.44 per share.  On November 15, 2011, the day after Cooper announced the expansion of the recall to include the Avaira Sphere lenses, its share price dropped $8.34, which represented over 13% of its value.  Defendants argue that these statements do not constitute corrective disclosures as required to establish loss causation because neither revealed that any of Defendants' prior statements were false or inaccurate.  However, Defendants' argument is premised on an assumption that, as a matter of law, none of their statements were false or misleading and none was made with the requisite scienter.  To the extent that the earlier statements were made with knowledge of falsity, then the MSNBC.com post and the press release announcing an expanded recall were corrective disclosures of false or misleading information.

Consistent with the finding on scienter above, because Plaintiffs have not adequately satisfied the scienter element to show that the prior disclosures were knowingly false when made, Plaintiffs have failed to allege that a misrepresentation or omission inflated share price.  As such, Plaintiffs have not alleged loss causation.

Based on the foregoing analysis, the Court **GRANTS** the Motion to Dismiss Count I of the Consolidated Amended Class-Action Complaint **WITH LEAVE TO AMEND**.

## C.   COUNT II:  CONTROL-PERSON LIABILITY UNDER SECTION 20(B)

Section 20(a) allows recovery against persons who exercise direct or indirect control over entities that violate Section 10(b).  *Zucco*, *supra*, 552 F.3d at 990.  Specifically, Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Thus, to state a claim for control-person liability under Section 20(b), plaintiffs must allege (1) "a primary violation of federal securities law" and (2) that "the defendant exercised actual power or control over the primary violator."  *Zucco*, *supra*, 552 F.3d at 990 (quoting *No. 84*

United States District Court
Northern District of California

United States District Court
Northern District of California

1  *Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945
2  (9th Cir. 2003).

3       Defendants argue that all claims for control-person liability under Section 20(a) of the
4  Exchange Act should be dismissed on the ground that Plaintiffs have failed to plead a primary
5  violation of Section 10(b).  Based on the determination that Plaintiffs have failed to plead a primary
6  violation, it follows then that they have failed to state a claim for control-person liability, as well.

7       Therefore, the Motion to Dismiss Count II is **GRANTED WITH LEAVE TO AMEND**.

8  **III.    CONCLUSION**

9       For the reasons set forth above, the Motion to Dismiss the Consolidated Amended Class-
10  Action Complaint is **GRANTED**.

11       Plaintiffs' Consolidated Amended Class-Action Complaint (Dkt. No. 43) is **DISMISSED WITH**
12  **LEAVE TO AMEND**.

13       Plaintiffs shall file a Second Consolidated Amended Complaint by no later than **February 4,**
14  **2013**.  Defendants' response(s) shall be due 30 days thereafter.

15       This Order Terminates Docket Number 46.

16       **IT IS SO ORDERED.**

17

18  Date: January 7, 2013
                                    _____
19                                   **YVONNE GONZALEZ ROGERS**
                                     **UNITED STATES DISTRICT COURT JUDGE**

20

21

22

23

24

25

26

27

28

22