United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **HAROLD GREENBERG, on behalf of himself and all others similarly situated,** | **Case No.: 11-CV-05697 YGR** |
| **Plaintiff(s),** | **ORDER GRANTING MOTION TO DISMISS WITHOUT LEAVE TO AMEND** |
| **vs.** | |
| **COOPER COMPANIES, INC. *et al.*,** | |
| **Defendant(s).** | |

Plaintiff, a purchaser of allegedly overpriced stock of Defendant Cooper Companies, Inc. ("Cooper"), brings this securities fraud class action against Cooper, its Chief Executive Officer Robert S. Weiss ("CEO Weiss"), and its former Chief Financial Officer Eugene J. Midlock ("CFO Midlock") (collectively "Defendants") for allegedly false and misleading statements made in connection with the recall of defective contact lenses.  The Second Consolidated Amended Complaint (Dkt. No. 71 ("SCAC")) alleges two claims:  (1) Securities Fraud Under Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b); and (2) Control-Person Liability Under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a).

Defendants filed a Motion to Dismiss (Dkt. No. 72 ("Motion")) the SCAC on the grounds that Plaintiff's amendments to the first consolidated amended complaint fail to cure the deficiencies identified in the Court's Order issued on January 7, 2012, granting the motion to dismiss.  The Court heard oral argument on April 16, 2013.

Having carefully considered the papers submitted, the SCAC, and the argument of counsel, for the reasons set forth more fully below, the Court hereby **GRANTS** the Motion to Dismiss **WITHOUT LEAVE TO AMEND**.  Plaintiff has not corrected the deficiencies identified in the previous

order dismissing the first consolidated amended complaint. The fact of a recall is insufficient by itself to support the claims alleged. While Plaintiff alleges that Defendants concealed material information from investors, insufficient facts are alleged to support a strong inference that the Defendants had knowledge of the allegedly omitted information and intended to deceive, manipulate, or defraud investors by concealing that information. Specifically, Plaintiff alleges that Cooper concealed customer complaints of severe eye injuries, but Plaintiff does not allege that customers complained *to* Cooper about severe eye injuries. Second, no particular facts are alleged to support an inference that when Cooper recalled one type of contact lens (Avaira Toric) that Defendants *knew* Cooper would later expand the recall to include a second type of contact lens (Avaira Sphere).

# I.    BACKGROUND

Cooper is a global medical products company that serves the specialty healthcare market through its two business units, Cooper Vision, Inc. ("CooperVision") and CooperSurgical, Inc. (SCAC ¶¶ 3, 21.) CooperVision is the third largest manufacturer of soft contact lenses in the world with approximately 17% of the global market share, which provides 84% of Cooper's revenue. (*Id.* ¶ 3.) CooperSurgical, Inc. markets diagnostic products, surgical instruments, and accessories for the women's healthcare market. (*Id.*) Cooper's common stock is traded on the New York Stock Exchange under the symbol "COO." (*Id.* ¶ 21.)

Plaintiff alleges that between August 19, 2011, and November 15, 2011 ("Class Period"), Defendants kept Cooper's stock price artificially inflated by concealing serious injuries to its customers in connection with a product recall and downplaying the design flaws in its "Avaira" line of contact lenses that eventually led to a second product recall. The SCAC alleges as follows:

## A.    COOPERVISION'S AVAIRA TORIC LENSES

The contact lens market has two major product categories: spherical lenses (to correct near and farsightedness); and toric lenses (to correct more complex visual issues including astigmatism). (*Id.* ¶ 3.)[1] Contact lenses are sold with recommended replacement schedules, often referred to as "modalities," which include single-use, two-week, and monthly. (Declaration of Stacey M. Sprenkel

---

[1] Cooper's contact lens portfolio also includes "multifocal lenses (for presbyopia) and cosmetic lenses." (SCAC ¶ 3.)

United States District Court
Northern District of California

("Sprenkel Dec.") ¶ 12, Ex. 11 at 5.)  CooperVision has a monthly silicone hydrogel lens called Biofinity and a two-week silicone hydrogel lens called Avaira.  At issue in this lawsuit is Cooper's Avaira product line.

                1.        *Importance of Silicone Hydrogel Lenses; Rush to Market; and Design Flaws.*

Cooper experienced declining sales of older, conventional and cosmetic lenses, with the vast majority of its net sales growth being generated by silicone hydrogel lenses.  (SCAC ¶¶ 4, 30.)  Both before and during the Class Period, Cooper acknowledged that its capability to continue to compete in the contact lens market depended on whether it could successfully develop and sell silicone hydrogel lenses.  (*Id.* ¶¶ 4, 29-30.)  Cooper had entered the silicone hydrogel lens market late relative to its competitors, and given the importance of silicone hydrogel products, this late entry threatened to limit Cooper's future growth.  (*Id.* ¶¶ 5, 31.)

As a result, Cooper rushed its silicone hydrogel lenses to production, fixing problems with the design of the lenses—problems that should have been resolved during research and development—while manufacturing the lenses.  (*Id.* ¶¶ 5, 32-33.)  When Cooper designed and developed the Avaira Toric and the Avaira Sphere lenses at its Pleasanton, California facility, the facility was not certified, registered or otherwise approved by state or federal regulatory agencies to develop medical products.  (*Id.* ¶¶ 7, 25, 37.)  Due to quality control problems and the rush to market, both Avaira lens types contained unsafe amounts of silicone oil residue.  (*Id.* ¶ 48.)  In turn, the unsafe amounts of silicone oil residue allegedly resulted in a high incidence of hazy vision, and eye pain reported by consumers of Cooper contact lenses, which, in turn, led to the recall of both Avaira lens types.  (*Id.*)

                2.        *Customer Complaints "Plague" the Avaira Product Line.*

On March 3, 2011, CFO Midlock announced that Cooper would be "rolling out" the toric version of its Avaira lens product line ("Avaira Toric") nationwide.  (*Id.* ¶ 51.)  The sphere version of the Avaira product line ("Avaira Sphere") had been on the market since 2008.  (Sprenkel Dec., Ex. 9 at 5.)  Cooper's monthly silicone hydrogel lens called Biofinity had been on the market since 2006.  (*Id.*, Ex. 2 at 12.)

United States District Court
Northern District of California

In February or March of 2011, Cooper allegedly began to receive a "significant" number of serious complaints about the Avaira lenses.  (SCAC ¶¶ 8, 40.)  The SCAC alleges that the customer complaints were of eye problems ranging from "eye stinging and hazy vision, to eye irritation, to eye abrasions, and finally to actual damage to the eye."  (*Id.* ¶ 42.)  By June 2011, the number of complaints had grown to "potentially as many as 200"[2] and there were discussions of recalling the lenses.  (*Id.* ¶¶ 43, 46, 61.)  By June or July 2011, CooperVision had launched an internal investigation into these complaints.  (*Id.* ¶ 46.)

### B.     "FALSE" AND "MISLEADING" STATEMENTS DURING CLASS PERIOD

Plaintiff identifies three sets of false and misleading statements made on (1) August 19, 2011, (2) August 31, 2011, and (3) September 2, 2011.

#### 1.     *August 19, 2011 Press Release Announcing Avaira Toric Recall.*

The first set stems from a press release issued on August 19, 2011, in which Cooper announced a "voluntary recall on limited lots of Avaira Toric contact lenses."  (*Id.* ¶¶ 9, 60.)  According to the press release, the recall was initiated because of the unintended presence of a residue on certain lenses.  (*Id.*)  The press release further notified consumers that a "manufacturing issue" causing the problem "ha[d] been identified and a resolution [wa]s in progress."  (*Id.*)  Cooper also set aside a reserve of over $14 million for recall-related liabilities at that time.  (*Id.* ¶ 89.)

Plaintiff alleges that the press release concealed material information two ways.  One, the press release significantly downplayed the number of the complaints Cooper had received and the severity of those complaints.  The press release indicated that "[t]he residue was identified after investigating *a small number of complaints of temporary hazy vision*."  (*Id.* ¶ 60 (emphasis in SCAC).)  Plaintiff alleges that this was false and misleading because Cooper had received "potentially in excess of 200" complaints,[3] and customers reported eye injuries as severe as "torn

---

[2] This allegation is less precise than the first consolidated amended complaint, which alleged that Cooper had received over 200 complaints.  (Dkt. No. 43 ¶¶ 27, 39, 54.)

[3] The Court notes a minor internal contradiction where Plaintiff alleges that Cooper only *received* "potentially *as many as* 200" complaints about its Avaira lenses, yet Plaintiff alleges that somehow Defendants were *aware of* more complaints than Cooper actually received:  "potentially *in excess of* 200."  (SCAC ¶¶ 46, 61 (emphasis supplied).)

United States District Court
Northern District of California

United States District Court
Northern District of California

corneas and other complaints that required emergency room treatment" (*id.* ¶ 61), although the SCAC never alleges that these severe problems were reported to Cooper.[4]

Two, Plaintiff alleges that the press release failed to disclose that the recall would be expanded to include the Avaira Sphere lenses.  In the press release, Cooper emphasized that "***[t]his recall is limited solely to specific lots of Avaira Toric, and no other CooperVision product is involved in this recall*.**"  (*Id.* ¶ 60 (emphasis in SCAC).)  Plaintiff alleges that at the time of this disclosure, Defendants already knew the Avaira Sphere lenses would be recalled because the lenses had the same excess silicone oil residue problems as the Avaira Toric lenses.  (*Id.*)

> **2.**      *August 31, 2011 Cooper Conference Call.*

The second instance of false and misleading statements occurred during an August 31, 2011 conference call.  Plaintiff alleges two more misstatements:  One, CEO Weiss "misleadingly" stated that "[a]side from the ***voluntary limited recall of Avaira Toric***, all of [CooperVision's] silicon [*sic*] hydrogels are performing well … ***as well as Avaira Sphere***."  (*Id.* ¶ 65 (emphasis in SCAC).)  Two, in response to a question about "the impact of the recall going forward," CEO Weiss stated that the recall's impact had already been "built into [Cooper's] guidance" and misrepresented that the recall is "***not a material event***."  (*Id.* ¶ 66 (emphasis in SCAC).)  According to the SCAC, these statements were false and misleading because "Defendants were aware that this [silicone oil] residue problem resulted in a high incidence of severe eye pain reported by consumers of Cooper contact lenses, including torn corneas, that required extensive medical treatment," and from this, Plaintiff alleges Defendants knew or should have known that the recall would be expanded to include Avaira Sphere lenses and were aware that this would severely impact Cooper's ability to meet its financial guidance. (*Id.* ¶ 68.)

---

[4] Plaintiff conceded at oral argument that Plaintiff cannot allege with more specificity paragraph 42 of the SCAC, which identifies customer complaints of "actual damage to the eye" rather than the more specific "torn cornea."  (*Compare* SCAC ¶ 42 (customer complaints ranged "from eye stinging and hazy vision, to eye irritation, to eye abrasions, and finally to actual damage to the eye") *with id.* ¶ 61 ("Defendants failed to disclose that the harms included torn corneas and other complaints that required emergency room treatment").)

3.      *September 2, 2011 Form 10-Q Filing with SEC.*

Two days later, on September 2, 2011, when Cooper filed its third quarter Form 10-Q with the Securities and Exchange Commission ("SEC"), a third set of allegedly false and misleading statements occurred.  The Form 10-Q reiterated that only the Avaira Toric contact lenses were being recalled and that the recall was based on a small number of complaints.  (*Id.* ¶ 69.)  Specifically, the Form 10-Q stated that "***no other CooperVision product is involved in this recall***" and "[t]he recall was initiated because of the unintended presence of a residue … ***identified after investigating a small number of complaints of temporary hazy vision***."  (*Id.* (Emphasis in SCAC.))  Cooper's Form 10-Q also stated that "[o]verall, we remain optimistic about the long-term prospects for the worldwide contact lens and women's healthcare markets."  (*Id.* (Alteration in SCAC.))  Plaintiff alleges that these two statements were false and misleading because "many consumers had complained of far more serious symptoms, including torn corneas and other complaints that required emergency medical treatment" and in the Form 10-Q, Defendants failed to disclose that the recall would be expanded to include Avaira Sphere lenses.  (*Id.* ¶¶ 70-71.)

**C.      THE "TRUTH" EMERGES**

1.      *First Drop in Stock Price—October 11 MSNBC.com Article about "Torn Corneas" and "Stealth Recall."*

On October 11, 2011, MSNBC.com published an article describing the serious complications consumers were having with the Avaira Toric lenses and described Cooper's "limited recall" as a "stealth recall" that left many consumers, and would-be investors, unaware of the severity of the safety problems.  (*Id.* ¶ 10.)  "The article focused on 'growing reports of eye problems ranging from blurry vision to torn corneas.'"  (*Id.* ¶ 73.)  After the MSNBC.com article posted, Cooper's stock traded on high volume and the price dropped 8.2%, or $6.44 per share.  (*Id.*)

According to the SCAC, on October 12, 2011,[5] a person using the pseudonym "foodbuglady"[6] discussed the MSNBC.com article in an on-line weblog or "blog" post.  (*Id.* ¶ 48.)

---

[5] The SCAC lists the year as 2012.

[6] The pseudonym used by the person posting on the blog is specified in Defendants' Motion to Dismiss, not the SCAC.

"The blog post described in detail the experience of certain consumers who suffered severe pain and eye injury from wearing Avaira lenses." (*Id.*)  Furthermore, according to 'foodbuglady,' "Cooper would not disclose when it first became aware of the lenses causing severe eye pain, but there was evidence that '*by September 27th, the company was aware of the complaints of scratched and torn corneas and severe eye pain.*'" (*Id.* (Emphasis supplied.))  Nothing in the MSNBC.com report or the "foodbuglady" blog post suggested that Defendants had knowledge of these issues by August 19, August 31, or September 2, 2011.

On October 13, 2011, in an apparent attempt to respond to the criticism of a "stealth recall," Cooper issued a press release. (*Id.* ¶ 11.)  "The press release continued to downplay the extent and severity of the problems leading to the recall and to mislead the public about the injuries suffered as a result, stating that the Company had received 'some additional complaints of severe eye pain' after initiation of the recall." (*Id.*)

On October 14, 2011, the Food and Drug Administration ("FDA") posted a Class I warning, calling for Cooper to issue a full notice to the public of the reasons for the recall of 778,301 of its Avaira Toric lenses. (*Id.* ¶¶ 12, 90.)  Class I warnings are the most serious issued by the FDA and "implicate serious adverse health consequences or death." (*Id.* ¶ 12.)  The FDA's action was prompted by its receipt of approximately 40 reports of problems associated with the Avaira Toric lenses, including reports of severe injuries that required emergency medical treatment, such as torn corneas. (*Id.*)

> ### 2. *Second Drop in Share Price—Avaira Sphere Recall.*

On November 15, 2011, Cooper expanded its recall to include the Avaira Sphere lenses, recalling approximately six million[7] Avaira Sphere lenses that had already shipped. (*Id.* ¶¶ 13, 71, 77.)  As with the August 2011 recall, Cooper blamed the November recall on silicone oil residue.  In contrast to the earlier recall, which it blamed on a "manufacturing problem," Cooper blamed the November 15, 2011 recall on the failure of the Avaira Sphere lenses to meet "updated quality

---

[7] The SCAC is not consistent in its allegations regarding the number of Avaira Sphere lenses that were recalled: "nearly five million" (SCAC ¶ 13), "nearly six million" (*id.* ¶ 77), or "[m]ore than six million" (*id.*¶ 71).

1  requirements." (*Id.* ¶ 13.)  Cooper also disclosed that it had reserved more than $23 million for

2  recall-related liabilities.  (*Id.* ¶¶ 13, 77.)

3          According to the SCAC, "[a]s a consequence of its revelations about the true quality of its

4  products, the price of Cooper's common stock fell from a closing price of $64.95 per share on

5  November 14, 2011, the day prior to the disclosure of the expanded recall, to a close of $56.64 per

6  share on November 15, 2011, the day of the announcement, on extremely heavy trading volume."

7  (*Id.* ¶ 14.)  This represented a loss of $8.34 per share, or nearly 13% of share value.  (*Id.*)

8          **D.    PROCEDURAL BACKGROUND**

9          This lawsuit was filed on November 28, 2011.  (*See* Dkt. No. 1.)  On February 29, 2012, the

10  Court appointed Plaintiff Universal-Investment-Gesellschaft mbH as the Lead Plaintiff pursuant to

11  the Private Securities Litigation Reform Act of 1995 ("PSLRA").  (*See* Dkt. No. 36.)  As Lead

12  Plaintiff, it filed a first consolidated amended complaint on May 4, 2012.  (Dkt. No. 43.)  On January

13  7, 2013, the Court dismissed the first consolidated amended complaint with leave to amend, primarily

14  on the grounds that Plaintiff failed to allege facts to support a strong inference of scienter.  (Dkt. No.

15  67 ("Order").)  Plaintiff filed the SCAC on February 4, 2013.  Defendants move for dismissal of the

16  SCAC on the grounds that it fails to correct the deficiencies identified in the Court's Order

17  dismissing the first consolidated amended complaint.

18  **II.    DISCUSSION**

19          The SCAC challenges five statements made on three different occasions.  As set forth below,

20  the first arises from the August 19, 2011 press release announcing the recall of the Avaira Toric

21  lenses.  The second and third were made by CEO Weiss during an August 31, 2011 conference call.[8]

22  The fourth and the fifth stem from the September 2, 2011 Form 10-Q.

23          (1)  CooperVision has initiated a voluntary recall on limited lots of Avaira® Toric
     contact lenses.  ***This recall is limited solely to specific lots of Avaira Toric, and no***
24     ***other CooperVision product is involved in this recall***.  The recall was initiated
     because of the unintended presence of a residue on certain lenses.  The residue was
25     identified after investigating ***a small number of complaints of temporary hazy vision.***

26

27  ───────────────
    [8] Plaintiff seeks to hold CFO Midlock responsible for both statements by arguing that CFO Midlock
    was present for the conference call (which is alleged in the SCAC) but failed to correct the
28  misstatements (which is not alleged in the SCAC).

> ***The manufacturing issue has been identified and a resolution is in process.*** It is anticipated Avaira Toric shipments will resume shortly, and inventory will return to normal levels by December 1, 2011.

(SCAC ¶ 60 (emphasis in SCAC).)

(2)   "Aside from the ***voluntary limited recall of Avaira Toric***, all of [CooperVision's] silicon [*sic*] hydrogels are performing well–Binfinity Sphere, Biofinity Toric, Biofinity Multifocal ***as well as Avaira Sphere***." (*Id.* ¶ 65 (emphasis in SCAC).)

(3)   "[O]n the impact of the recall going forward, it's much more about replenishing inventory and trial sets than it is about what it's done in the market. … So I would say the impact is going forward, it's built into our guidance and ***it's not a material event***." (*Id.* ¶ 66 (emphasis and alteration in SCAC).)

(4)   "Overall, we remain optimistic about the long-term prospects for the worldwide contact lens and women's healthcare markets." (*Id.* ¶ 69.)

(5)   In August 2011, CooperVision initiated a voluntary recall on limited lots of Avaira Toric contact lenses. This recall is limited solely to specific lots of Avaira Toric, and ***no other CooperVision product is involved in this recall***. The recall was initiated because of the unintended presence of a residue on certain lenses. ***The residue was identified after investigating a small number of complaints of temporary hazy vision***. The manufacturing issue has been identified and a resolution is in process. We anticipate inventory will return to normal levels by December 1, 2011.

(*Id.* (Emphasis in SCAC.))

A.   **LEGAL FRAMEWORK**

To withstand a motion to dismiss for failure to state a claim, a complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Additionally, because this is an action for securities fraud, "the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). When ruling on a motion to dismiss a claim brought under Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b), a court must consider the complaint in its entirety, as well as other sources that courts ordinarily examine when ruling on such motions, in particular, documents incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Tellabs, Inc. v.*

United States District Court
Northern District of California

9

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).[9]  The Court first analyzes Count I brought under Section 10(b) of the Securities and Exchange Act, 15 U.S.C. § 78j(b).  As set forth in Section II.E, *infra*, the analysis of Count II for Control-Person Liability under Section 20(a) of the Securities and Exchange Act, 15 U.S.C. § 78t(a), flows from the analysis of Count I.

Section 10(b) of the Securities and Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security … any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements this provision by making it unlawful to, among other things, "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).

To state a Section 10(b) claim, Plaintiff must allege facts sufficient to establish (i) that the defendant made a material misrepresentation or omission of fact; (ii) that the misrepresentation was made with scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance on the misrepresentation or omission; (v) loss causation; and (vi) economic loss.  *Metzler Inc. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

Defendants challenge the allegations in the SCAC concerning the elements of:  (1) scienter, (2) material misstatement, and (3) loss causation.  Because scienter is central to Plaintiff's claim for securities fraud, the Court will focus its analysis on that element.

## B.     FIRST ELEMENT: SCIENTER

Scienter refers to "a mental state embracing intent to deceive, manipulate, or defraud."  *See Tellabs*, *supra*, 551 U.S. at 319; *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976) ("In certain areas of the law, recklessness is considered to be a form of intentional conduct for purposes of

---

[9] The Court takes judicial notice of the exhibits attached to the Sprenkel Declaration.  The Court takes judicial notice of the fact that certain documents were publicly-filed and the fact that certain statements were made in those documents on the dates specified, but not the truth of the statements contained therein.

imposing liability for some act."). Under the PSLRA, the complaint must state with particularity "facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) *compare with* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"). The required state of mind is "that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 991 (9th Cir. 2009). Deliberate recklessness is "'a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *Id.* (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 976 (9th Cir. 1999), *abrogated by statute on other grounds as recognized in South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).

In ruling on a motion to dismiss, the Court must not consider the factual allegations in isolation, but instead, the Court must determine whether, taken collectively, all the facts alleged give rise to a strong inference of scienter during the Class Period itself, here, August 19, 2011 to November 15, 2011. *Tellabs*, *supra*, 551 U.S. at 322-23, 326 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically"); *South Ferry*, *supra*, 542 F.3d at 784 ("The Supreme Court's reasoning in *Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement"). "When conducting this holistic review, however, [a court] must also 'take into account plausible opposing inferences' that could weigh against a finding of scienter." *Zucco*, *supra*, 552 F.3d at 1006 (quoting *Tellabs*, *supra*, 551 U.S. at 323). For the inference of scienter to be "strong," it must be "cogent" and "*at least as likely* as any plausible opposing inference" of nonfraudulent intent that can be drawn from the facts alleged. *Tellabs*, *supra*, 551 U.S. at 324-26, 328 (emphasis in original).

Considered holistically, the allegations in the SCAC fail to raise a strong inference of scienter, that Defendants intended to deceive, manipulate, or defraud investors either by downplaying problems with Cooper's Avaira Toric lenses or by concealing that the Avaira Sphere lenses would later be recalled.

### 1.   Deficiencies in Consolidated Amended Complaint.

The Court's earlier Order dismissing the Consolidated Amended Complaint ("CAC") identified three primary problems with the scienter allegations:  (1) there were insufficient facts to support the inference that Defendants were aware of *any* problems with the Avaira lenses prior to announcing a recall on August 19, 2011; (2) Plaintiff never alleged that anyone at Cooper was aware of the more severe problems associated with its Avaira Toric lenses, such as torn corneas, prior to the October 11, 2011 MSNBC.com article reporting these more severe problems; and (3) there were insufficient facts to support a strong inference that prior to the November 15, 2011 recall of the Avaira Sphere lens and the statements made, at the latest, on September 2, 2011, that Defendants knew the Avaira Sphere lenses were defective and would be recalled.[10]  In the SCAC, Plaintiff attempts to address the first two deficiencies (subsection 2, *infra*) but the SCAC does not add any facts to address the third deficiency (subsection 3, *infra*).[11]

---

[10] Specifically, the Order stated:

> Plaintiffs speculate, but do not allege specific facts about Defendants' knowledge of and exposure to the problems regarding the Avaira lenses prior to the first recall on August 19, 2011.  Moreover, Plaintiffs never allege that Cooper was aware of the more severe problems associated with its Avaira Toric lenses, such as torn corneas, prior to the October 11, 2011 MSNBC.com article.  Further, Plaintiffs fail to allege that prior to the November 15, 2011 recall of the Avaira Sphere lens that Defendants knew there were defects with its Avaira Sphere lenses, or that the Defendants had any reason to suspect that the Avaira Sphere lenses might contain the same defects as its Avaira Toric lenses.

(Order at 11.)

[11] In the previous Order of dismissal, the Court conducted the scienter analysis by independently—and then "holistically"—evaluating (i) the "core operations inference"; (ii) the individual Defendants' suspicious stock sales; and (iii) the statements of confidential witnesses.  In contrast to the first consolidated amended complaint, however, Plaintiff no longer argues that (i) the "core operations inference" independently suffices to establish a strong inference of scienter; or (ii) the Defendants made stock sales during the relevant Class Period.

Previously Plaintiff alleged that the individual Defendants concealed and downplayed the problems with the Avaira lenses in order to manipulate Cooper's stock price so they could profit from this insider information through illicit stock sales.  However, because all insider stock sales were made prior to August 19, 2011, Plaintiff no longer alleges the individual Defendants had this motivation to manipulate share price.  While "the absence of a motive allegation is not fatal," it is a consideration in the "holistic" review of the complaint.  *See Tellabs*, *supra*, 551 U.S. at 324.

2.      *Summary of New Scienter Allegations re Avaira Toric Lenses.*

Plaintiff proffers three changes that it argues correct the deficiencies with the scienter allegations regarding problems with the Avaira Toric lenses:  First, the class period begins on August 19, 2011 rather than March 4, 2011.  Thus, Plaintiff no longer seeks to hold Defendants liable for alleged misrepresentations made prior to the announcement of the first product recall.

Second, Plaintiff has added allegations regarding a blog post by "foodbuglady," who wrote that Cooper may have been aware of the more serious problems with its Avaira Toric lenses "as early as September 27, 2011."  From this allegation, Plaintiff argues that it now alleges that Cooper was aware of the more severe problems associated with its Avaira Toric lenses, such as torn corneas, prior to the October 11, 2011 MSNBC.com article.  Although Plaintiff's argument is literally true, it is misleading because all of the alleged misrepresentations were made weeks before September 27, 2011.  Knowledge as of September 27, 2011 does not support the requisite scienter for statements made on August 19, August 31, and September 2, 2011.  More fundamentally, however, Plaintiff has made no attempt to show that "foodbuglady" has sufficient personal knowledge of the information she posted on a blog so that Plaintiff may rely on those statements to satisfy the PSLRA's pleading requirements.  *See Zucco*, *supra*, 552 F.3d at 995 (requiring "an adequate basis for determining that the witnesses in question have personal knowledge of the events they report.").

Third, Plaintiff argues, albeit mistakenly, that it alleges in the SCAC that Cooper received complaints of torn corneas and severe eye damage prior to launching an internal investigation in June/July 2011.  (Dkt. No. 76, Plaintiff's Opposition, ("Opp'n") at 5, 9.)  At oral argument, counsel for Plaintiff acknowledged that the SCAC does not make this allegation; the SCAC alleges only that the problems reported to Cooper prior to the August 19, 2011 recall announcement involved unspecified "actual damage to the eye."  (*See* SCAC ¶ 42.)

Plaintiff asks the Court to infer that Cooper received as many as 200 complaints of serious eye injuries, including torn corneas and other complaints that required emergency medical treatment, and that Defendants knew about these complaints.  (*See*, *e.g.*, *id.* ¶ 70.)  Plaintiff argues that a blog post, an FDA Class I warning, and an MSNBC.com article corroborate the statements of two of its

United States District Court
Northern District of California

Confidential Witnesses ("CW1" and "CW2").[12]  CW2 was aware of "as many as 200" complaints from consumers, and CW1 recalls that these complaints included "actual damage to the eye."[13]  (*Id.* ¶¶ 42, 46.)  CW2 reported to CooperVision's Engineering Director, Samuel Puig, who in turn reported to CooperVision's Vice President of Quality Assurance and Regulatory Affairs, Christine Meonch; Ms. Meonch attended "periodic senior management meetings with Defendant Weiss at which Meonch reported about quality matters."  (*Id.* ¶¶ 25, 44.)[14, 15]  CW1 understood that these meetings necessarily included discussions of quality matters because such discussions were required to maintain ISO 13458 and ISO 9001 certifications.[16]  (*Id.* ¶ 45.)  Additionally, Plaintiff argues that it would be impossible for Cooper to set aside a $14 million reserve without Defendants' knowledge and involvement.

Plaintiff argues that it "strains credulity past the breaking point" for Defendants to claim they did not know there were severe problems with the Avaira Toric lenses or that the recall would be expanded to include the Avaira Sphere lenses where:

> [Cooper] (1) experienced declining sales in its older contact lenses and was worried

---

[12] The SCAC attributes certain allegations to a total of five confidential witnesses.  The allegations attributed to information provided by the other three confidential witnesses ("CW3," "CW4," and "CW5") are unrelated to customer complaints.

[13] The SCAC never expressly alleges that Cooper received reports from customers complaining of "actual damage to the eye."  The Court is drawing this inference from statements attributed to CW1: According to CW1, at a Wednesday quality control meeting, CooperVision's Engineering Director, Samuel Puig used a "Pareto Analysis" to rank the severity of customer complaints "from eye stinging and hazy vision, to eye irritation, to eye abrasions, and finally to actual damage to the eye."  (SCAC ¶ 42.)  By implication, if the "Pareto Analysis" ranked complaints and included a category for complaints of "actual damage to the eye," one may reasonably infer that at least one complaint in that category existed.

[14] Plaintiff alleges that CooperVision President John Weber "was informed about the quality problems."  (SCAC ¶ 45.)  In the consolidated amended complaint, Plaintiff connected Weber's knowledge to CEO Weiss by alleging that Weber "reported directly to Defendant Weiss."  (CAC ¶ 25.)  Plaintiff no longer makes this second allegation that would connect Weber's knowledge to CEO Weiss.

[15] Plaintiff does not allege that any of this information was conveyed to CFO Midlock.

[16] According to the SCAC, ISO certification represents requirements for comprehensive quality management systems.  (SCAC ¶ 45.)

competitors' silicone hydrogel models posed a risk to its business; (2) entered the silicone hydrogel market late and worked to catch up despite limited manufacturing capacity; (3) was rushing its silicone hydrogel lenses to production[17]; (4) received up to 200 complaints about the Avaira lenses between February/March 2011 and June/July 2011, ***including complaints of torn corneas and severe eye damage*** that were ***tracked*** via a graphical "Pareto analysis"[18]; (5) launched an internal investigation into these complaints at some point during or before June/July 2011; (6) completed the internal investigation, determined that a design/manufacturing problem, consisting of excess silicone oil residue, caused the problems; (7) initiated a recall of specified Avaira Toric lots; (8) announced the creation of a $14 million reserve to cover recall-related costs; (9) worked with the FDA to develop new quality standards for both the Avaira Toric and Avaira Sphere lenses; (10) expanded the August 19, 2011 recall to encompass Avaira Sphere lenses; and (11) increased the recall-loss reserve to $23 million.

(Opp'n 9 (emphasis supplied).)

>   3.   *Analysis of Allegations re Defendants' Knowledge of Injuries.*

Although Plaintiff never alleges that Cooper received complaints of "torn corneas" or "severe eye pain" *prior* to making any of the challenged statements, Plaintiff asks the Court to draw this inference.  The factual allegations in the SCAC do not support an inference that Defendants had the knowledge urged.  The specific knowledge alleged in the SCAC is that when announcing the recall on August 19, 2011, "Defendants failed to disclose that the harms included torn corneas and other complaints that required emergency room treatment."  (SCAC ¶ 61.)  No facts are alleged to support

---

[17] Previously Plaintiff attributed design flaws to developing the lenses in a facility that was not registered to make medical equipment.  (*See* Dkt. No. 50 at 18-19 (Defendants "eschewed state and federal oversight in designing its newest silicone hydrogel lenses, the Avaira line, at home in its Pleasanton headquarters").)  Now Plaintiff alleges that the lenses were flawed because Cooper rushed its silicone hydrogel lenses to production, and fixed problems with the design during the manufacturing phase instead of during the research and development phase.

[18] The emphasized language is not alleged in the SCAC.  In Plaintiff's opposition to the motion to dismiss the CAC, Plaintiff also recited a sequence of events that included facts not alleged in the complaint to argue that "[i]t strains credulity past the breaking point to suggest Defendants were unaware any of this was going on."  (*See* Dkt. No. 50 at 19.)  In rejecting Plaintiff's argument that the core operations inference independently sufficed to support a strong inference of scienter, the Court pointed out that four of eleven facts on which Plaintiff's argument relied were not alleged in the CAC and that Plaintiff's brief exaggerated two other facts.  (Order at 8-9.)  Plaintiff misreads this part of the Court's prior Order as identifying shortcomings in the CAC; the Court took no position on whether those facts would satisfy the scienter requirement.

1  an inference that Cooper had received such complaints, let alone that Defendants were aware of such

2  complaints.

3          On August 31, 2011, CEO Weiss made a representation about "the impact of the recall going

4  forward," that "it's not a material event."  The SCAC alleges that when CEO Weiss made this

5  statement, "Defendants were aware that this [silicone oil] residue problem resulted in a high

6  incidence of severe eye pain reported by consumers of Cooper contact lenses, including torn corneas,

7  that required extensive medical treatment."  (*Id.* ¶ 68.)  There are no particularized allegations about

8  Defendants' knowledge of a "high incidence of severe eye pain."

9          On September 2, 2011, when Cooper filed its third-quarter Form 10-Q with the SEC, Plaintiff

10 alleges Defendants knew "many consumers had complained of far more serious symptoms, including

11 torn corneas and other complaints that required emergency medical treatment."  (*Id.* ¶ 70.)  Again,

12 the SCAC lacks the particulars to explain how Defendants were aware of these problems with the

13 Avaira Toric lenses.

14         Based upon the allegation that Cooper received reports of unspecified "actual damage to the

15 eye," Plaintiff asks the Court to infer that if the FDA, MSNBC.com, and "foodbuglady" received

16 reports from consumers experiencing torn corneas *in October 2011*, then Defendants must have

17 known about these problems prior to initiating a product recall and setting a reserve of $14 million.

18 The Court cannot make this inferential leap.  Not even the statements attributed to CW1 or CW2

19 support this inference.

20         Plaintiff argues that even though CW1 and CW2 themselves were not aware of these more

21 severe problems, the Court should infer that Defendants so aware.  The inference is not sustainable.

22 Moreover, it is less compelling than the contrary inference, namely, that Defendants, like CW1 and

23 CW2, were *not* aware of complaints of "serious" eye problems requiring "emergency" medical

24 treatment.

25         Based on the foregoing, the Court finds that Plaintiff fails to allege facts that give rise to a

26 strong inference that when Defendants made the challenged statements, they knew or should have

27 known of these more serious problems with the Avaira Toric lenses.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

4.      *Analysis of Allegations re Defendants' Knowledge of the Quantity of Complaints.*

Plaintiff additionally alleges that Defendants misrepresented the number of complaints that Cooper had received about its Avaira Toric lenses when Cooper announced that it was recalling the Avaira Toric lenses "because of the unintended presence of residue … ***identified after investigating a small number of complaints*** …."  (SCAC ¶¶ 60, 69 (emphasis in SCAC).)  By contrast, the SCAC alleges that at the time of this announcement, "Defendants were aware of an unusually high volume of complaints, potentially in excess of 200."  (*Id.* ¶ 61; *see also id.* ¶ 70 ("many consumers had complained of far more serious symptoms").)  To support this allegation, Plaintiff includes a statement attributed to CW1, claiming that as early as February or March 2011, Cooper had received "a significant number of complaints about Avaira lenses," (*id.* ¶ 40), and that "by June/July 2011, CW2 was aware of numerous complaints, potentially as many as 200," which allegedly would have been reported at senior management meetings (*id.* ¶ 46; *see*, p. 14, *supra*.)  External sources allegedly corroborate those figures:  on October 11, 2011, MSNBC.com described the number of injury reports as still "growing"[19] and on October 14, 2011, the FDA announced that it had received "at least 40 reports of problems associated with CooperVision's Avaira Toric lenses."  (*Id.* ¶¶ 10, 12, 47.)

For CEO Weiss to have had knowledge of 200 complaints, the Court must infer that between June/July 2011 and August 19, 2011 (the date of the press release announcing the product recall) or September 2, 2011 (the date Cooper filed its third-quarter Form 10-Q), Defendants knew the number of complaints was potentially in excess of 200 because Meonch, who attended a "periodic senior management meeting" with Weiss, must have reported the number of complaints Cooper had received about Avaira lenses at that meeting.  Although Plaintiff alleges that this information "must have been discussed amongst upper management," Plaintiff does not allege that any of this information was conveyed to CFO Midlock.  (*See id.* ¶¶ 44-45.)  The inference without more remains tenuous.  However, the Court previously explained that:  "[b]y announcing that Cooper conducted an investigation into complaints  …, it is fair to infer that Cooper actually investigated the complaints

---

[19] However, according to the article, MSNBC.com had received "at least a dozen" complaints from consumers.  (Sprenkel Dec., Ex. 18 at 1.)

and that the Defendants knew or should have known about the number of complaints that Cooper had received," (Order at 15-16), which Plaintiff alleges to be "potentially as many as 200."

When viewed holistically, the SCAC fails to allege sufficient facts to support a *strong* inference of scienter. Insufficient facts are alleged regarding Defendants' knowledge of customer complaints about the Avaira Toric lenses when they made any of the five challenged statements.

### 5. Allegations re Avaira Sphere recall.

The SCAC does not correct the pleading issues regarding the expanded recall into the Avaira Sphere lenses that the Court identified in its previous Order of dismissal. In that Order, the Court concluded that Plaintiff failed to allege sufficient facts that Defendants' disclosures prior to the November 15, 2011 recall of the Avaira Sphere lens were made with the knowledge that its Avaira Sphere lenses might contain the same defects as its Avaira Toric lenses or that its Avaira Sphere lenses would be recalled.

Plaintiff does not materially change the scienter allegations with respect to the Defendants' knowledge of problems with the Avaira Sphere lenses, including the knowledge that the Avaira Sphere lenses would be recalled.[20] Additionally, Plaintiff makes the same arguments regarding the sufficiency of those same allegations: namely, Defendants "knew from their consumer complaints and internal investigation that the Avaira Sphere lenses had the same excess residue problem and many lots needed to be pulled from the market." (*Compare* Dkt. No. 50 at 12-13 *with* Opp'n at 19-20.) At oral argument, counsel for Plaintiff conceded that the SCAC does not allege that consumers complained about the Avaira Sphere lenses. Additionally, the SCAC does not allege that Defendants knew from an internal investigation that the Avaira Sphere lenses had the same oil residue problem as the Avaira Toric lenses. Furthermore, Plaintiff does not allege Cooper's stated reason for recalling the Avaira Sphere lenses was false—*i.e.*, that certain lots did not meet updated quality requirements. Thus, Plaintiff still does not allege facts from which to infer that at the time Defendants made any of

---

[20] *Compare* CAC ¶ 54 ("Defendants knew or were deliberately reckless in not knowing that Avaira Spheres were also defective, because they were designed and developed in the same Pleasanton facility that was not properly certified by regulatory agencies") *with* SCAC ¶ 61 ("Defendants knew or were deliberately reckless in not knowing that Avaira Spheres were also defective, as the Avaira Sphere lenses also lacked silicone-oil standards and specifications necessary to avoid the build up of residue").

United States District Court
Northern District of California

the challenged statements, the Defendants knew the August 19, 2011 recall of Avaira Toric lenses would be expanded to include Avaira Sphere lenses.

When viewed holistically, the SCAC fails to allege sufficient facts to support a strong inference that between August 19, 2011 through November 15, 2011, Defendants downplayed the severity of its customer complaints about the Avaira Toric lenses or that Defendants concealed that the recall would be expanded to include Avaira Sphere lenses.

Based on the foregoing analysis, the Court concludes that the SCAC fails to satisfy the scienter element.

### C.   SECOND ELEMENT:  MATERIAL MISSTATEMENT

When a plaintiff's claim is based on a misrepresentation or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *Metzler*, *supra*, 540 F.3d at 1061 ("vague allegations of deception unaccompanied by a particularized explanation stating why the defendant's alleged statements or omissions are deceitful" fails to state a claim).

For an omission to be actionable under the securities laws, it must be misleading as to a material fact.  *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Under the "total mix" standard of *Basic Inc. v. Levinson*, an omission is material if there is "'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  485 U.S. 224, 231-32 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "[I]n other words it must affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists."  *Brody*, *supra*, 280 F.3d at 1006.

Plaintiff's position is that any statement about the recall was misleading if Cooper did not disclose both that Cooper had received hundreds of complaints, including complaints of torn corneas and other serious eye injuries requiring emergency medical treatment, and disclose that it would expand the recall to include Avaira Sphere lenses.  Additionally, Plaintiff's apparent position is that

any statement about the financial impact of problems with the Avaira product line was misleading if it did not disclose that the problems with the Avaira lenses would adversely impact Cooper's ability to meet its fiscal guidance.

The Court previously wrote that:

> [i]f a company has received a large number of complaints of problems with its contact lenses, including complaints of torn corneas and other problems that require emergency room treatment, it may be misleading to omit that information when disclosing an investigation into "a small number of complaints of temporary hazy vision." Likewise, stating that a recall is limited to certain lots of toric contact lenses may be misleading if the speaker knows that the recall will not be so limited. That Cooper's share price dropped 8.2% and 13.1% when this information became public demonstrates that investors considered this information to be material. Depending on what the Defendants knew and when they knew, certain statements that proved to be wrong in hindsight may have been material misrepresentations and/or omissions.

(Order at 17-18.) Consistent with the finding on scienter above, the prior Order (*see id.* at 20), and because Plaintiff has not adequately pled that the challenged statements were knowingly false or misleading when made, Plaintiff has failed to allege sufficient facts to satisfy the material misrepresentation element for a claim of securities fraud.

*Safe Harbor*: Defendants argue that all of the challenged statements fall within the PSLRA's safe harbor provision. The PSLRA provides "a safe harbor for forward-looking statements identified as such, which are accompanied by meaningful cautionary statements." *Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004). "A 'forward-looking statement' is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003). The safe-harbor provision does not apply to a description of past or present events. *Id*. at 936-37. "[I]f a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112 (9th Cir. 2010). Alternatively, if a forward-looking statement is not identified as such or is unaccompanied by meaningful cautionary statements, then the statement is actionable

1    only if the plaintiff alleges that the forward-looking statement "was made with actual knowledge by

2    that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B); *see Provenz v.*

3    *Miller*, 102 F.3d 1478, 1487 (9th Cir. 1996).

4         Here, Defendants argue that portions of four challenged statements are identified as forward-

5    looking statements and are accompanied by meaningful cautionary language.  In the previous Order,

6    the Court stated that "simply because part of a statement contains a prediction does not place the

7    entire statement under the PSLRA's safe harbor provision."  (Order at 20.)  That said, although

8    Defendants argue only that *portions* of challenged statements are forward-looking, they argue that

9    "[d]ismissal of all claims arising out of these statements on safe harbor grounds is therefore

10   appropriate."  (Motion at 23-24.)  Defendants have provided no legal authority or analysis to support

11   dismissal of an entire claim on the basis that a portion of a lengthy allegedly material

12   misrepresentation is forward-looking.

13        In conclusion, Plaintiff has failed to allege sufficient facts to satisfy the material

14   misstatement element for a claim of securities fraud.  However, Defendants have not persuaded the

15   Court that all of the statements challenged by Plaintiff actually fall under the PSLRA's safe harbor

16   provision.  Therefore, although the Court will dismiss the SCAC for failure to plead the

17   misstatement element, the Court will not dismiss on safe harbor grounds, except to the extent that

18   Plaintiff concedes.[21]

19        **D.    THIRD ELEMENT:  LOSS CAUSATION**

20        Loss causation refers to the causal connection between the material misrepresentation or other

21   fraudulent activity and the loss.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005)

22   (inflated purchase price will not itself constitute or proximately cause the relevant economic loss); 15

23   U.S.C. § 78u-4(b)(4) ("the act or omission of the defendant … caused the loss for which the plaintiff

24   seeks to recover damages.").  To plead loss causation, Plaintiff must allege three elements:  (1) a

25

26   ─────────────────────

     [21] Plaintiff conceded at oral argument that a fifth challenged statements is forward looking and,

27   therefore, is protected by the PSLRA's "safe harbor" provision:  "Overall, we remain optimistic
     about the long-term prospects for the worldwide contact lens and women's healthcare markets."

28   (SCAC ¶ 69.)

United States District Court
Northern District of California

United States District Court
Northern District of California

misrepresentation or omission inflated the share price; (2) a corrective disclosure[22] revealed the statement was fraudulent; and (3) as a result of the disclosure, share price fell.  *See Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1046 (N.D. Cal. 2012) (citing *Dura*, *supra*, 544 U.S. at 342).

The SCAC identifies decreases in share price following the October 11, 2011 MSNBC.com article regarding a "stealth recall" and the November 15, 2011 press release announcing an expanded recall.  Defendants argue that these are not corrective disclosures because neither disclosure revealed that an earlier statement was false or misleading.  To the extent that the earlier challenged statements were made with scienter, then the MSNBC.com post and the press release announcing an expanded recall were corrective disclosures of some of the allegedly false or misleading information.[23]

Consistent with the finding on scienter above, because Plaintiff has not satisfied the scienter element as to the concealment of information revealed by the MSNBC.com post or November 15, 2011 press release, Plaintiff has not alleged that a material misrepresentation or omission kept the share price artificially inflated and that as a result of a corrective disclosure, the share price fell.  As such, Plaintiff has not alleged loss causation.

Based on the foregoing analysis, the Court **GRANTS** the Motion to Dismiss Count I.

**E.    IMPACT ON COUNT II:  CONTROL-PERSON LIABILITY UNDER SECTION 20(a)**

Section 20(a) allows recovery against persons who exercise direct or indirect control over entities that violate Section 10(b).  *Zucco*, *supra*, 552 F.3d at 990; *see In re OmniVision*

---

[22] A corrective disclosure is a disclosure to the market of information that corrects prior misstatements.  *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 229 (5th Cir. 2009); *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266-67 (S.D. Cal. 2010) ("A 'corrective disclosure' is a disclosure that reveals the fraud, or at least some aspect of the fraud, to the market.") (quoting *Teamsters Local 617 Pension & Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763, 818 (D.Ariz. 2009)) (citations omitted).

[23] Plaintiff has not identified a corrective disclosure that revealed the alleged falsity of Defendants' statements regarding the number of complaints Cooper received—*i.e.*, a disclosure revealing that when Cooper announced that it had investigated "a small number of complaints" Cooper had actually received "as many as 200 complaints."  MSNBC.com reported that it had received approximately twelve complaints from consumers *not* that Cooper had received "as many as 200 complaints." (Sprenkel Dec., Ex. 18 at 1.)  Thus, even if the Court were to find the allegations of scienter were sufficient with respect to Defendants' disclosures regarding the number of complaints Cooper received, Plaintiff still fails to allege the loss causation element.

1     *Technologies, Inc. Sec. Litig.*, —F. Supp. 2d—, 2013 WL 1334250 (N.D. Cal. Mar. 29, 2013)

2     ("Liability under Section 20(a) is established by showing that a primary violation of the Exchange

3     Act was committed and that the defendant directly or indirectly controlled the violator") (citing

4     *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996)).  To state a claim

5     for control-person liability under Section 20(a), Plaintiff must allege (1) "a primary violation of

6     federal securities law" and (2) that "the defendant exercised actual power or control over the primary

7     violator."  *Zucco*, *supra*, 552 F.3d at 990 (quoting *America West Holding Corp.*, *supra*, 320 F.3d at

8     945).[24]

9         Based on the foregoing determination that Plaintiff has not pled a primary violation, it follows

10     that Plaintiff has not pled control-person liability either.

11         Therefore, the Court **GRANTS** the Motion to Dismiss Count II.

12         **F.**    **LEAVE TO AMEND NOT GRANTED**

13         In dismissing a complaint for failure to state a claim, leave to amend should be granted even if

14     no request to amend was made, unless the court determines that amending the pleading could not

15     possibly cure the deficiency.  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir.

16     2003) (citing *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996)).  Denying leave to amend is

17     appropriate if amendment would be futile.  *Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368

18     F.3d 1053, 1061 (9th Cir. 2004) ("district court does not err in denying leave to amend where the

19     amendment would be futile") (quoting *Saul v. United States*, 928 F.2d 829, 843 (9th Cir. 1991)).

20         Plaintiff was provided with an opportunity to cure the deficiencies in its first consolidated

21     amended complaint but failed to do so.  At the hearing on the motion the Court specifically inquired

22     into whether Plaintiff could provide any additional facts to support its claims.  Plaintiff's counsel

23

24     [24] Specifically, Section 20(a) provides:

25         Every person who, directly or indirectly, controls any person liable under any
        provision of this chapter or of any rule or regulation thereunder shall also be liable

26         jointly and severally with and to the same extent as such controlled person to any
        person to whom such controlled person is liable, unless the controlling person acted in

27         good faith and did not directly or indirectly induce the act or acts constituting the
        violation or cause of action.

28     15 U.S.C. § 78t(a).

conceded that no such facts are forthcoming and offered no additional legal theories to support its claims. Based on the foregoing, the Court concludes that Plaintiff cannot cure the deficiencies of its claims through further amendment, and that granting further leave to amend would be futile. *See Eminence Capital*, *supra*, 316 F.3d at 1053 (where plaintiff cured some but not all deficiencies in PSLRA complaint, further leave to amend warranted where plaintiff was not acting in bad faith and might be able to state claim upon further amendment). Therefore, dismissal of the SCAC is **WITHOUT LEAVE TO AMEND**.

## III.    CONCLUSION

For the reasons set forth above, the Motion to Dismiss the Second Consolidated Amended Class-Action Complaint is **GRANTED**.

Plaintiff's Second Consolidated Amended Class-Action Complaint (Dkt. No. 71) is **DISMISSED WITHOUT LEAVE TO AMEND**.

A form of judgment shall be prepared by the Defendants.

This Order Terminates Docket Number 72.

**IT IS SO ORDERED.**

Date: May 31, 2013

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

24